IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE, TENNESSEE

| | | |
|---|---|---|
| BRISTOL TENNESSEE ESSENTIAL SERVICES; BOARD OF PUBLIC UTILITIES OF THE TOWN OF ERWIN, TENNESSEE; and MOUNTAIN ELECTRIC COOPERATIVE, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | CASE NO.: _____ |
| V. | ) ) | |
| UNITED TELEPHONE SOUTHEAST, LLC, d/b/a CENTURYLINK, | ) ) ) | |
| Defendants. | ) | |

## COMPLAINT

Come Plaintiffs, Bristol Tennessee Essential Services ("BTES"), Board of Public Utilities of the Town of Erwin, Tennessee, ("Erwin"), and Mountain Electric Cooperative, Inc., ("Mountain") (sometimes collectively referred to herein as "Power Distributors"), and for their Complaint against Defendant, United Telephone Southeast, LLC, d/b/a CenturyLink ("CenturyLink") assert:

### PARTIES

1. The Power Distributors provide electricity to three geographical areas in Northeast Tennessee:

A. Plaintiff, Bristol Tennessee Essential Services, is a Tennessee municipal electric plant created pursuant to the Municipal Electric Plan Law of 1935. BTES' service area includes the City of Bristol, Tennessee, and portions of Sullivan County, Tennessee; and, its principal place of business in located in Bristol, Sullivan County, Tennessee.

B. Plaintiff, Erwin, is a Tennessee municipality lying within Unicoi County, Tennessee. Erwin's serves customers in Unicoi County, Tennessee. Its principal place of business is located in Erwin, Unicoi County, Tennessee.

C. Plaintiff, Mountain, is a Tennessee corporation providing electric power to its members. Its principal place of business is located at 604 South Church Street, Mountain City, Johnson County, Tennessee. Mountain serves customers in Johnson County, Tennessee, and parts of Carter and Unicoi Counties in Tennessee.

All three Plaintiffs were created pursuant to Tennessee law to provide the lowest cost electricity possible to their customers/members. All three have their principal places of business in Tennessee and in no other states.

2. Defendant, CenturyLink, is a Virginia limited liability company whose principal place of business is located at 5454 West 110th Street, Overland Park, Kansas. CenturyLink is the successor-in-interest to United Intermountain Telephone Company, a Virginia corporation. CenturyLink provides telephone services in a number of states, including the areas served by the Power Distributors. The Agreements at issue in this civil action were executed and entered into in the State of Tennessee. CenturyLink is not, and has never been, a Tennessee corporation.

## JURISDICTION AND VENUE

3. Jurisdiction is predicated upon 28 U.S.C. § 1332, diversity of citizenship of the parties hereto. The Power Distributors are Tennessee municipalities, Tennessee municipal power plants or Tennessee cooperatives with principal places of business located in the Eastern District of Tennessee. CenturyLink is a limited liability company formed under the laws of the Commonwealth of Virginia, whose principal place of business is located at 5454 West 110th Street, Overland Park, Kansas. The amount in controversy exceeds $75,000.00, exclusive of costs and interest.

4. Venue is proper in that the claims for relief of the Power Distributors arose in the Eastern District of Tennessee.

## STATEMENT OF FACTS

5. CenturyLink's predecessor-in-interest, United Inter-Mountain Telephone Company, entered into essentially identical agreements with BTES, Erwin, and Mountain with an effective date of July 1, 1980. Said respective agreements differ only as to identity of the Power Distributors entering into the Agreement with CenturyLink. Said Agreements will be collectively referred to as "United Agreement."

6. The United Agreement has been amended five (5) times, since its initial effective dates. Power Distributors attach hereto as EXHIBIT 1, the BTES original Agreement and first three (3) amendments to the BTES Agreement. (BTES is utilized as representative of all three Agreements).

7. Amendment No. One (12/31/80), Amendment No. Two (12/31/82), and Amendment No. Three (11/14/95) dealt primarily with modifications to the pole adjustment/attachment payments which each separate Power Distributor makes to CenturyLink and CenturyLink, in turn, makes to each Power Distributor. These adjustments or attachment payments arise out of the fact CenturyLink has its lines and equipment on poles belonging to the Power Distributors and the Power Distributors have some fewer lines and equipment on poles belonging to CenturyLink (i.e., joint use poles).

8. At the end of 2008, CenturyLink or its predecessors created a crisis which constituted a breach of the United Agreement by refusing to make pole adjustment/attachment payments for 2008. The Power Distributors proceeded to intervene in Docket No. 08-00219 before the Tennessee Regulatory Authority wherein Embarq Corporation and CenturyTel, Inc., (predecessors of CenturyLink) were seeking approval of their proposed merger. The purpose of the intervention was to seek assurances that the merged company would not operate in the unacceptable manner that Embarq (a predecessor to CenturyLink and a parent of United Telephone Southeast, LLC) had operated in the preceding several years.

9. The intervention by the Power Distributors forced CenturyLink to enter into negotiations over the various disputes that existed with the Power Distributors, including the 2008 payments mentioned in Paragraph 8 above. Those negotiations resulted in a SETTLEMENT AGREEMENT, which resolved some but not all disputes between the Power Distributors and CenturyLink. A copy of that SETTLEMENT AGREEMENT is submitted herewith as EXHIBIT 2. Its effective date was April 14, 2009.

10. The Power Distributors and CenturyLink continued to negotiate and continued to dispute the amounts owed by CenturyLink to the Power Distributors and over other terms and

conditions of the United Agreement and the business relationship between the Power Distributors and CenturyLink. Eventually, the parties were able to agree upon and enter into Amendment No. Four to the United Agreement, effective January 2010. This Amendment No. Four is submitted herewith as <u>EXHBIT 3</u>. However, certain other remaining disputes, including the remaining net amounts due to the Power Distributors for pole adjustment/attachment payments for 2008 and for 2009, remained outstanding, even though CenturyLink made a partial payment for 2008, accepted by the Power Distributors under protest.

11. When CenturyLink refused to reach agreement with the Power Distributors on all issues, including, but not limited to, the amounts due for pole adjustment/attachment payments for 2008 and 2009, the Power Distributors and three other TVA Power Distributors located in Northeast Tennessee filed suit in this Court in Case No. 2:10-cv-48, the Court being referred to all documents which are contained in that case.

12. The Power Distributors and other Plaintiffs in Case No. 2:10-cv-48 and CenturyLink mediated that civil action and entered into a Settlement Agreement effective 10/28/10. A portion of that Settlement Agreement, which resulted in the dismissal of Case No. 2:10-cv-48, was the execution by the Power Distributors and CenturyLink of Amendment No. Five to the United Agreement, said Amendment No. Five being submitted herewith as <u>EXHIBIT 4</u>.

13. The net effect of the disputes, the civil action, the settlements and the Amendments to the United Agreement was that said United Agreement was substantially amended and formulas were put in place which would determine the amounts of the pole adjustment/attachment payments the Power Distributors and CenturyLink would make going forward, even beyond January, 2020. (See, e.g., Amendment No. 5, <u>EXHIBIT 4</u>).

14. However, certain portions of the United Agreement were not altered or amended by the various agreements, amendments, and litigation occurring between 2008 and 2010. Unaltered was ARTICLE XII, Section D, which reads as follows:

> "D. At intervals not exceeding five (5) years an actual inventory of attachments shall be made by representatives of the parties. If there is any difference in the number of attachments found by the inventory and the number arrived at by tabulating those reported, correction will be made by retroactive billing for any attachments identified as being responsible for the difference, and any remaining difference will be spread evenly over the years since the last inventory, and billing adjusted accordingly."

ARTICLE XII, Section D remains in full force and effect as of the date of filing of this civil action.

15. ARTICLE XII, Section D comes into play because of a portion of the SETTLEMENT AGREEMENT, effective April 14, 2009, same being <u>EXHIBIT 2</u> hereto. ARTICLE II and ARTICLE III of said SETTLEMENT AGREEMENT (<u>EXHIBIT 2</u>) read as follows:

> "ARTICLE II:     <u>Pole Attachment Inventory</u>
>
> 2.1 Concurrent with the NESC Audit, Embarq will, at its own expense, conduct a count of the number of attachments of all parties on all jointly used poles used by the parties (estimated to be approximately 140,000 poles) and identify the attaching parties on those jointly used poles ("Pole Attachment Inventory"). The Pole Attachment Inventory will be completed within 12 months of the Effective Date. The Pole Attachment Inventory will be conducted by a contracting firm approved by the parties, and such firm will possess the following minimum qualifications: (a) 10 years experience in conducting pole inventories; (b) technical expertise in mapping, data management, reporting and reconciliation of conflicting source data; and (c) ability to provide inventory results in a data format acceptable to the parties.
>
> 2.2 Tennessee Power Distributors will collaborate with Embarq in the performance of the Pole Attachment Inventory. The scope and guidelines for the Pole Attachment Inventory will be jointly developed by the Tennessee Power Distributors and Embarq prior to undertaking the inventory, including, but not limited to: (a) the parties' participation in coordination meeting; (b) the parties' review of, reconciliation and concurrence with the results of the Pole Attachment Inventory; and (c) the parties' certification of the final Pole Attachment Inventory results.

> 2.3 Any difference in the number of poles attached by either party identified as a result of the Pole Attachment Inventory to be conducted as set forth in this ARTICLE II will be subject to the terms of each of the United Agreements as of the Effective Date, including, but not limited to, the issue of back rental to be paid for unauthorized attachments discovered as a result of the pole attachment inventory discussed in this ARTICLE II, said back rental to be determined as set forth in ARTICLE XII of the United Agreements or as otherwise permitted by applicable law.
>
> **ARTICLE III:** **Baseline Data**
>
> 3.1 The results of the NESC Audit and Pole Attachment Inventory will establish the baseline data upon which all future audits and inventories will be measured. Additionally, future adjustment payments will reflect the pole count data resulting from the Pole Attachment Inventory, and future invoicing will be adjusted accordingly."

16. Following the settlement of Case No. 2:10-cv-48 and the execution by the parties of Amendment No. Five (EXHIBIT 4); and, pursuant to ARTICLE II and ARTICLE III of the SETTLEMENT AGREEMENT (EXHIBIT 2 and quoted directly above), CenturyLink engaged a third party contractor to "conduct a count of the number of attachments of all parties on all jointly used poles used by the parties...and identify the attaching parties on those jointly used poles..." (*Id.*, ARTICLE II, Section 2.1). This inventory or pole count was named the "Pole Attachment Inventory."

17. Once the Pole Attachment Inventory was completed by CenturyLink's contractor, CenturyLink and the Power Distributors reviewed the findings and agreed on the results of the Pole Attachment Inventory. Submitted herewith as EXHIBITS 5, 6 and 7 are the letter agreements entered into by CenturyLink and the Power Distributors relative to the number and ownership of joint use poles. Specifically, the following were agreed upon:

| | | |
|---|---|---|
| A. | BTES: | Number of BTES poles to which CenturyLink is attached – 16,482; number of CenturyLink poles to which BTES is attached – 5,643 (<u>EXHIBIT 5</u>). |
| B. | Erwin: | Numbers of Erwin poles to which CenturyLink is attached – 6,294; number of CenturyLink poles to which Erwin is attached – 1,211 (<u>EXHIBIT 6</u>) |
| C. | Mountain: | Number of Mountain poles to which CenturyLink is attached – 15,168; number of CenturyLink poles to which Mountain is attached – 3,235 (<u>EXHIBIT 7</u>). |

EXHIBITS 5, 6 and 7 establish the total number of joint use poles which existed the effective date of said respective letter agreements. These numbers, thus, allowed the Power Distributors to yearly bill CenturyLink for joint pole attachments commencing in 2011 and going forward. The results of the Pole Attachment Inventory also disclosed that there were a significant number of unauthorized attachments which CenturyLink was utilizing and for which CenturyLink had not been paying for on a yearly basis. Specifically, CenturyLink's Pole Attachment Inventory established that CenturyLink should have been making yearly joint pole attachment payments since 1980 for an additional 4,814 attachments on BTES poles and that BTES had been making joint pole attachment payments to CenturyLink since 1980 on 180 more CenturyLink poles than it should have. The numbers for Erwin and Mountain established that CenturyLink had underpaid Erwin for 427 attachments since 1992 and Mountain for a net 5,603 attachments since 1994.

18. It is averred that the results of CenturyLink's Pole Attachment Inventory which disclosed unauthorized attachments by CenturyLink, as discussed in Paragraph 17 above, makes CenturyLink liable to each of the Power Distributors for which the Power Distributors were entitled to retroactively bill, pursuant to ARTICLE XII, Section D, of the United Agreement

(quoted above). While said Section D seemingly requires a Pole Attachment Inventory every five (5) years, CenturyLink and the Power Distributors chose to waive that requirement as part of their course of dealing from 1980 through the 2010 Pole Attachment Inventory. In the case of BTES, no Pole Attachment Inventory was performed by CenturyLink and BTES from 1980 to 2010. In the case of Erwin, CenturyLink was billed by Erwin for unauthorized joint-use pole attachments in 1986, covering the period 1979-1986, in 1992 for 1987-1992, and in 2005 for 1992-2005. The 2005 billing was not the result of a Pole Attachment Inventory by CenturyLink and Erwin. Rather, Erwin used internal numbers which proved to be incorrect (too low) when the 2010 CenturyLink Pole Attachment Inventory was completed. On each occasion, 1986, 1992, and 2005, CenturyLink honored and paid the bill submitted by Erwin, never raising the five (5) year period discussed in ARTICLE XII, Section D of the United Agreement (EXHIBIT 1). In the case of Mountain, CenturyLink was billed for unauthorized joint use pole attachments for the period 1989 – 1994, following a Pole Attachment Inventory in 1994. CenturyLink made the payment for the period 1989-1994.

19. As a result of CenturyLink's 2010 Pole Attachment Inventory, it was verified that CenturyLink was indebted to BTES, Erwin, and Mountain for (net) unauthorized joint use pole attachments as discussed in Paragraph 17 above. The following bills were submitted to CenturyLink pursuant to CenturyLink's own inventory results:

    A. BTES: $1,987,051.73 (1980-2010) (EXHIBIT 8);

    B. Erwin: $145,047.65 (1992-2010) (EXHIBIT 9);

    C. Mountain: $1,544, 157.63 (1995-2010) (EXHIBIT 10).

20. Those respective billings, pursuant to said ARTICLE XII, Section D, constitute "...retroactive billing for any attachments identified as being responsible for the difference, and any remaining difference will be spread evenly over the years, since the last inventory, and billing adjusted accordingly." (*Id.*). Hence, the BTES bill spreads the difference evenly between 1980 and 2010; the Erwin bill, between 1992 and 2010 (taking into account the additional number of unauthorized joint pole attachments discovered by the 2010 Pole Attachment Inventory); and, Mountain, between 1995 and 2010.

21. Upon receipt of said bills from each of the Power Distributors, CenturyLink, unilaterally, arbitrarily and in breach of the various agreements with the Power Distributors, refused to pay the bills. Instead, CenturyLink chose to submit payment to each Power Distributor for the period 2006-2010 on the basis that CenturyLink read "...the July 1, 1980 Agreement, as amended, to allow unbilled attachments identified in an inventory to be spread evenly over the previous five years." Attached as EXHIBITS 11, 12 and 13, are the letters to each Power Distributor. As such, there is a significant amount of money due and owing each Power Distributor which CenturyLink has refused to pay and for which it is liable:

| | | | |
|---|---|---|---|
| A. | BTES: | Billed: | $1,987,051.73 |
| | | CenturyLink Offered: | $ 520,201.66 |
| | | Difference: | $1,466,850.07 |
| | | | (EXHIBIT 11) |
| B. | Erwin: | Billed: | $145,047.64 |
| | | CenturyLink Offered: | $ 49,921.55 |
| | | Difference: | $ 95,126.10 |
| | | | (EXHIBIT 12) |
| C. | Mountain: | Billed: | $1,544,157.63 |
| | | CenturyLink Offered: | $ 606,837.53 |

Difference: $ 937,320.20

(EXHIBIT 13)

BTES, Erwin, and Mountain have all refused said partial payment, and assert CenturyLink owes each of them the amount billed as determined by CenturyLink's own Pole Attachment Inventory.

22. It is averred that CenturyLink cannot unilaterally impose a five year limitation to limit its liability under the language of ARTICLE XII, Section D, and the course of dealing which has developed over the years between CenturyLink and each Power Distributor.

23. It is averred CenturyLink is estopped from imposing a five year limitation on its own liability because same breaches the United Agreement, and is contrary to the terms and conditions which govern the business relationship among the parties and because same unjustly enriches CenturyLink.

## COUNT I: BREACH OF CONTRACT

24. The Power Distributors restate and incorporate by reference all material and inducing portions of Paragraphs 1-24 of this Complaint.

25. Under ARTICLE XII, Section D of the United Agreement, CenturyLink is contractually obligated to pay each Power Distributor for unauthorized joint pole attachments which it has made and had the benefit of since 1980. As set forth hereinabove, CenturyLink's own Pole Attachment Inventory established that it owes BTES - $1,987,051.73, Erwin - $145,047.65, and Mountain - $1,544,157.63 which it has failed and refused to pay in breach of ARTICLE XII, Section D of the United Agreement (EXHIBIT 1).

26. BTES, Erwin, and Mountain hereby sue CenturyLink for said breach of contract and demand damages and relief in the amounts set forth hereinafter.

## COUNT II: UNJUST ENRICHMENT

27. The Power Distributors restate and incorporate by reference all material and inducing portions of Paragraphs 1-24 of this Complaint.

28. Since 1980, CenturyLink has engaged in systematic, unauthorized attachments of its telephone lines to poles belonging to BTES, Erwin, and Mountain. By not paying the Power Distributors for these attachments, CenturyLink's income and profits benefitted significantly, as it was required by the United Agreement to pay for each attachment each year and did not do so.

29. As such, by failing/refusing to pay for said attachments, but having the benefits of same, CenturyLink has been unjustly enriched as established by its own Pole Attachment Inventory in 2010. CenturyLink purposefully chose not to take or request pole attachment inventories at five year or other intervals after 1980 because it knew it had made numerous unauthorized attachments and hoped to avoid paying for same.

30. As a result of said unjust enrichment, CenturyLink should be ordered to pay the Power Distributors the amount by which it has been unjustly enriched since 1980 through 2010. BTES, Erwin, and Mountain hereby sue CenturyLink for unjust enrichment and demand damages and relief in the amounts set forth hereinafter.

WHEREFORE, Plaintiffs, Bristol Tennessee Essential Services, the Board of Utilities of the Town of Erwin, Tennessee, and Mountain Electric Cooperative, Inc., DEMAND

JUDGMENT AGAINST Defendant United Telephone Southeast, LLC d/b/a CenturyLink and PRAY FOR THE FOLLOWING:

1. Money damages to BTES from CenturyLink for breaching its contracts with BTES in the amount of $1,987,051.73;

2. Money damages to BTES from CenturyLink for the unjust enrichment of CenturyLink at the expense of BTES in the amount of $1,987.051.83;

3. Money damages to Erwin from CenturyLink for breaching its contracts with Erwin in the amount of $145,047.65;

4. Money damages to Erwin from CenturyLink for the unjust enrichment of CenturyLink at the expense of Erwin in the amount of $145,047.65;

5. Money damages to Mountain from CenturyLink for breaching its contracts with Mountain in the amount of $1,544,157.63;

6. Money damages to Mountain from CenturyLink for the unjust enrichment of CenturyLink at the expense of Mountain in the amount of $1,544,157.63;

7. Prejudgment interest on all damages awarded each Plaintiff; and

8. General relief, discretionary costs, and all other relief deemed necessary and proper by the Court.

Respectfully submitted,

BRISTOL TENNESSEE ESSENTIAL SERVICES;
BOARD OF PUBLIC UTILITIES OF THE TOWN
OF ERWIN, TENNESSEE; and MOUNTAIN
ELECTRIC COOPERATIVE, INC.

By: _____
William C. Bovender (BPR #751)
Jimmie C. Miller (BPR # 009756)
Joseph B. Harvey (BPR #028891)

**HUNTER, SMITH & DAVIS, LLP**
1212 N. Eastman Road
P. O. Box 3740
Kingsport, TN 37664
Ph: (423) 378-8800
Fx: (423) 378-8801
*Counsel for Plaintiffs*